See also D.C., 223 F.Supp. 684.

---

**Donald R. LORD et al.**

v.

**Alvin M. KELLEY et al.**

**Civ. A. No. 63-932.**

United States District Court
D. Massachusetts.

April 13, 1965.

Lawrence F. O'Donnell and John Warren McGarry, Boston, Mass., for plaintiffs.

Murray Falk, Asst. U. S. Atty., W. Arthur Garrity, Jr., U. S. Atty., for defendants.

WYZANSKI, District Judge.

**I.**

This is a case that presents in microcosm the fascination, challenge, and risk of arbitrariness of proceedings in a District Court.

There are two ways to approach the petition here filed for attachment for civil contempt and punishment for criminal contempt. One way—perhaps the usual and certainly the more cautious way,— is, in the phraseology of the street, "to play the matter cool": that is, recite with simplicity the facts; briefly state the applicable principles of law; and purge all statements of any kind of color or life. The other way to approach this case is to make visible what is known to every sophisticated observer of this litigation and to use such skill as the judge possesses to put in rounded fashion and with perceptive understanding the basic nature of the controversy.

There are no doubt particular dangers in the second approach. Throughout American history it has been apparent that there are undesirable consequences when a judge whose decree is alleged to have been violated sits in judgment on a claim that someone contemptuously violated that decree. Moreover, it has frequently been pointed out that even if the Constitution of the United States does not guarantee a jury trial in a case involving the alleged criminal contempt of a judge's equitable order, it is contrary to the radiations of the Constitution for a judge to sit without a jury in a criminal matter.

Yet, surprisingly enough, although the present case has been made explicitly a criminal as well as a civil proceeding for contempt, neither counsel has asked either that I should disqualify myself or that I or some other judge should sit with a jury. Perhaps it would not be too unflattering to say that I think that this omission was not intended as a compliment to me but was due to the characteristic method in which this case was inadequately prepared on both sides.

■ Despite Lord Coke, law is not primarily artificial reason; it is a combination of precedent, pressure, and principle. The judge who has to find the facts and state his conclusions is caught in a swirl of forces, some of which go back to ancient times, more of which reflect current struggles for power, and not a few of which are connected with ultimate interests. To settle disputes in such a vortex one ought, if possible, to be completely detached. Indeed, a non-involved position is always a desideratum. Can this be accomplished when the very nature of the case suggests that the court has been affronted? By the definition of the offense of contempt the judge is himself immersed in the controversy as one of the factors of principal importance.

Recognizing this dilemma, I might disqualify myself, although no one has asked me to do so. No one could know better than I that in all aspects of life— not only in court—while reason purports to hold sway, passion is antecedent to reason and, indeed, the very condition of its effective exercise.

Though a pallid timidity suggests that a self-regarding prudence might lead me to disqualify myself, in this particular instance it seems even more important to show that one is capable of what Spinoza said was the root of moral growth: the capacity to invoke one emotion to drive out another emotion. I hope that these findings and conclusions will prove that a passion for justice may prevail over a passion for indignation. At any rate, no kind of controversy more fully reveals the character and capacity of a court than its consideration of controversies concerning contempt.

## II.

To understand this contempt case we must begin by facing up to the fact that the Government is in pursuit of a taxpayer, McGarry, who is certainly not the ordinary type of law-abiding businessman. It would be most undesirable for me to describe dramatically an individual who may ultimately be faced with a criminal prosecution in which he is entitled to the benefit of the presumption of innocence. Yet it would be naive not to recognize that in the evidence already taken in this and cognate proceedings, it appears that McGarry engaged in dubious activities, has a manner which suggests a conspiratorial purpose, and lacks the usual earmarks of civic excellence.

Believing, on what basis, of course, I need not state, that McGarry is a wilful evader of federal income taxes, the Internal Revenue Service has been checking up on him and looking into available information about his gross receipts. The matter has hardly been as open to inspection as a goldfish bowl. The taxpayer has barricaded himself within the home that is his castle—as no doubt he had a right to do. The Government, with more doubtful propriety, has sat in surveillance on him with binoculars and other watchful devices even more reflective of current technological development. In effect, what has been going on are the preliminaries to what both sides recognize to be a probable all-out war.

The Government took the first step over the boundary of peaceful activity by making what this Court and the Court of Appeals have found to be an unlawful search and seizure of records kept within the house.

Their blood up from the first fray, the agents of the Internal Revenue Service were none too pleased to be brought into Court and held to account. I trust I shall not be misunderstood when I say that the Internal Revenue agents select cases on the theory that they have not merely the general capacity to know when tax evasions are serious, but also the special competence to single out what kinds of offenders ought to be punished. After all, we all know that the Internal Revenue Service must choose its targets among thousands of tax violators and, in fact, does choose in the light of what is current policy in administrative circles.

When this Court found that the Internal Revenue agents had violated the law and directed that the improperly seized records were to be returned, the agents were, to say the least, not happy. The original appearance in this Court by counsel for the Government was, if not insolent, at least none too respectful. The brief filed following the Court's adverse decision and asking for reconsideration thereof, showed more than hurt feelings and came close to being worthy of a rebuke.

More than once the judges of a court have been indirectly reminded that they personally are taxpayers. No sophisticated person is unaware that even in this very Commonwealth the Internal Revenue Service has been in possession of facts with respect to public officials which it has presented or shelved in order to serve what can only be called political ends, be they high or low. And a judge who knows the score is aware that every time his decisions offend the Internal Revenue Service he is inviting a close inspection of his own returns. But I suppose that no one familiar with this Court believes that intimidation, direct or indirect, is effective.

In any event, this Court, having adhered to its own decision that the Internal Revenue agents had denied Lord's constitutional rights, and having been affirmed by the Court of Appeals, the Internal Revenue Service returned, or purported to return, to the taxpayer those documents which under the Order the authorities were bound to restore.

As permitted by the Court's Order, the Government then proceeded to carry out its tax investigation of McGarry using material which allegedly had not been acquired by the unlawful search and seizure and which allegedly had not been derived from clues consequent upon that unlawful search and seizure.

It is plain enough from what has been testified in this Court that McGarry's counsel and the counsel for the Internal Revenue Service were not congenial. Acrimony was translated into acerbity.

Curiously, and in a way that no one has bothered to explain to this Court, a former Internal Revenue Service agent, Young, disclosed to McGarry's lawyer that some of the material being used by the Government represented the results of the unlawful search and seizure which had been condemned by this Court. The record before me does not reveal whether Young left the Service voluntarily. However, there is no indication that anything could have been said against his character or his Governmental service.

While he was on the stand, though Government counsel had adequate opportunity to examine him, no question was put in which he was subjected to the slightest reproach.

Whatever may have been Young's experience and motivation, he disclosed what he knew. On the record as it stands before me, it would appear that Young is entitled to have echoed on his behalf the splended tribute to Louis R. Glavis by Louis D. Brandeis:

> "The danger in America is not of insubordination, but it is of too complacent obedience to the will of superiors. With this great Government building up, ever creating new functions * * * the one thing we need is men in subordinate places who will think for themselves and who will think and act in full recognition of their obligations as part of the governing body * * *. We want every man in the Service * * to recognize that he is part of the governing body, and that on him rests responsibility within the limits of his employment just as much as upon the man on top * * * they cannot be worthy of the respect and admiration of the people unless they add to the virtue of obedience some other virtues—the virtues of manliness, of truth, of courage, of willingness to risk positions, of the willingness to risk criticisms, of the willingness to risk the misunderstandings that so often come when people do the heroic thing."

I believe what Young said, and, therefore, find it more probable than not that on at least the following specific matters agents of the Internal Revenue Service disobeyed the Order of this Court:

1. Defendant John B. Flattery, one of the agents of the Internal Revenue Service, who was directed by this Court to return McGarry's unlawfully seized records, and to suppress all data in connection with those records, in wilful defiance of this Court's order used a part of those records relating to AAA Vending Company to pursue a lead to Bay State Security Corporation, and another part of those records relating to "Ye Olde Brown Jug" to pursue a lead to S. D. Breen, an insurance broker, and to Curry's Woodworking Company.

2. Defendant John B. Flattery, acting through his subordinate, Robert M. Ferrick, who himself is not a defendant, in wilful defiance of this Court's order used the cash receipts and disbursements book of "Ye Olde Brown Jug", (being part of the unlawfully seized records heretofore mentioned,) to pursue leads with respect to checks and other financial transactions.

No evidence was offered to show that in any respect whatsoever defendants Kelley, Calhoun, or McNally was involved in any violation of this Court's Order.

But Flattery's deliberate violations must be weighed against his and other Government agents' scrupulous compliance in other respects with the procedure required by my Order.

■ I, therefore, conclude as a matter of law that while an Internal Revenue agent intended to step very close to defying the clear lines of my Order and, indeed, in a few places, more probably than not, consciously walked over the border, this degree of defiance does not quite rise to the level of criminal contempt.

■ Criminal contempt is a matter in which the complaining party has the burden of proving his case beyond a reasonable doubt. While I am persuaded that more probably than not Internal Revenue Agent Flattery in this case did wilfully act contrary to my Order in certain specific respects, I have just that margin of uncertainty which constitutes a reasonable doubt. Therefore, I acquit him, (as well of course as the defendants against whom no evidence was offered) of the charge made against him that he was in criminal contempt.

■ So far as concerns the aspect of this case which involves civil contempt, the Court is in an anomalous position. No evidence whatsoever has been offered that the complaining party has sustained

any damage which would appropriately give rise to a justified claim for economic compensation. Hence, there is wanting the foundation appropriate to allow a civil recovery. On that basis I dismiss the petition with respect to civil contempt as well as with respect to criminal contempt.

Nothing in this opinion relates to what, if any, effect these proceedings may have upon the propriety of any criminal indictment which may be returned, upon a motion to dismiss such indictment, or the conduct of a trial with respect to any indictment that may be presented. All such matters lie in the womb of time. If they emerge they must be drawn by appropriate procedure to the attention of some judge who can then make any necessary decision. All that I need say is that I now disqualify myself from hearing any further matter with respect to any aspect of this case. The reasons for the disqualification seem to me evident in this Opinion.

Motions for contempt denied.